Richard Lyon (Cal. Bar No. 229288)
rick@dovel.com
Simon Franzini (Cal. Bar No. 287631) simon@dovel.com
Jonas B. Jacobson (Cal. Bar No. 269912)
jonas@dovel.com
Gabriel Doble (Cal. Bar No. 335335)
gabe@dovel.com
Martin Brenner (Cal. Bar No. 333540)
martin@dovel.com
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DEBRA GOLDSTEIN, individually and on behalf of all others similarly situated, | Case No. 2:23-cv-04752-JWH-JDE |
| *Plaintiff,* | **Plaintiff's Opposition to Defendants' Coordinated Motion to Dismiss Amended Complaints** |
| v. | |
| WHIRLPOOL CORPORATION, | Date: November 22, 2024 |
| *Defendant.* | Time: 9:00 a.m.<br>Place: Courtroom 9D<br>Judge: Hon. John W. Holcomb |

# Table of Contents

I.    Introduction..................................................................................................11

II.   Plaintiffs plausibly allege that Defendants' gas stoves emit hazardous levels of pollutants, as this Court correctly held.................................................12

III.  Plaintiffs have Article III standing..........................................................19

    A.    Plaintiffs plausibly allege injury in fact, as this Court correctly held...........19

    B.    Plaintiffs have standing to seek injunctive relief.............................................22

IV.   The First Amendment has no bearing on Plaintiffs' claims. ...................24

    A.    The First Amendment does not protect fraudulent or misleading conduct. ...........................................................................................................25

    B.    The First Amendment does not protect violations of generally applicable laws. ............................................................................................26

    C.    Defendants' First Amendment argument fails under *Zauderer*. .................27

    D.    Defendants' First Amendment argument also fails under intermediate scrutiny. ..................................................................................30

V.    Proposition 65's notice requirement does not bar Plaintiffs' claims. ......31

VI.   The EPCA does not preempt Plaintiffs' claims, as this Court correctly held. .......37

    A.    42 U.S.C. § 6297(c) does not preempt Plaintiffs' claims. ...........................37

    B.    42 U.S.C. § 6297(a) does not preempt Plaintiffs' claims. ...........................40

VII.  Plaintiffs plausibly allege omission-based fraud claims, as this Court correctly held. ..........................................................................................41

    A.    Plaintiffs plausibly allege Defendants' pre-sale knowledge. .......................41

    B.    Plaintiffs plausibly allege a duty to disclose.................................................42

    C.    Plaintiffs plausibly allege reliance. ...............................................................45

    D.    Plaintiffs plausibly allege UCL "unlawful" and "unfair" claims. .................45

VIII. Plaintiffs plausibly allege implied warranty claims, as this Court correctly held. ..........................................................................................................46

    A.    Plaintiffs plausibly allege that their gas stoves were unmerchantable..........46

B.   Defendants' warranty disclaimer argument does not apply to
     Plaintiffs' Song-Beverly Act claims. ...................................................47

C.   Defendants' warranty disclaimer argument fails because Defendants'
     disclaimers were not conspicuous. ......................................................48

IX.   Plaintiffs plausibly allege unjust enrichment, as this Court correctly held.............49

X.   Plaintiffs plausibly allege entitlement to punitive damages......................................49

XI.   Conclusion. ...............................................................................................50

# Table of Authorities

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) .................................................................41

*Am. Acad. of Pain Mgmt. v. Joseph*,
353 F.3d 1099 (9th Cir. 2004) ...............................................25, 30, 31

*Anderson v. Apple Inc.*,
500 F. Supp. 3d 993 (N.D. Cal. 2020)..............................................43, 44

*Bankhurst v. Wolf Appliance, Inc.*,
2024 U.S. Dist. LEXIS 117734 (W.D. Wis. July 2, 2024)....................38

*Barnes v. Nat. Organics, Inc.*,
2022 U.S. Dist. LEXIS 169864 (C.D. Cal. Sept. 13, 2022)...............34, 36

*Bennett v. Council 31 of the AFSCME*,
991 F.3d 724 (7th Cir. 2021) ...............................................................26

*Birdsong v. Apple, Inc.*,
590 F.3d 955 (9th Cir. 2009) ...............................................................20

*Bland v. Sequel Nat.*,
2019 U.S. Dist. LEXIS 232738 (N.D. Cal. Jan. 18, 2019) ...............34, 36

*Cahen v. Toyota Motor Corp.*,
147 F. Supp. 3d 955 (N.D. Cal. 2015)...................................................22

*Cal. Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) .............................................................28, 29

*Cal. Rest. Ass'n v. City of Berkeley*,
65 F.4th 1045 (9th Cir. 2023) ...............................................................40

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,
152 F.3d 1184 (9th Cir. 1998) ..............................................................41

*Capbran Holdings, LLC v. Firemall LLC*,
2017 U.S. Dist. LEXIS 171875 (C.D. Cal. Feb. 1, 2017)......................37

*Castillo v. Prime Hydration LLC*,
  2024 U.S. Dist. LEXIS 161851 (N.D. Cal. Sept. 9, 2024) ...................................17

*Castle v. Schriro*,
  2009 U.S. Dist. LEXIS 98473 (D. Ariz. Oct. 21, 2009)...................................26

*CFTC v. EOX Holdings L.L.C.*,
  2021 U.S. Dist. LEXIS 188090 (S.D. Tex. Sept. 30, 2021) ...........................26

*Chabner v. United of Omaha Life Ins. Co.*,
  225 F.3d 1042 (9th Cir. 2000) ...................................................................32

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) ...................................................................................25

*Cohen v. Cowles Media Co.*,
  501 U.S. 663 (1991) ..............................................................................26, 27

*CTIA - The Wireless Ass'n v. City of Berkeley*,
  928 F.3d 832 (9th Cir. 2019) ...............................................................28, 29

*Ctr. for Self-Improvement & Cmty. Dev. v. Lennar Corp.*,
  173 Cal. App. 4th 1543 (2009) ................................................................32

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) ................................................................45

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) .......................................................22, 23, 24

*Drake v. Haier US Appliance Sols. Inc.*,
  2024 U.S. Dist. LEXIS 25169 (N.D. Cal. Feb. 13, 2024)..............31, 37, 38, 39, 45, 47

*Drimmer v. Wd-40 Co.*,
  2006 U.S. Dist. LEXIS 112640 (S.D. Cal. Aug. 3, 2006)...............................47

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ...................................................................................30

*Fain v. Am. Honda Motor Co.*,
  2019 U.S. Dist. LEXIS 230731 (C.D. Cal. Dec. 19, 2019)...............................43

*Fla. Bar v. Went for It, Inc.*,
   515 U.S. 618 (1995) ........................................................................... 31

*Grausz v. Hershey Co.*,
   2024 U.S. Dist. LEXIS 14237 (S.D. Cal. Jan. 25, 2024) ............................ 19, 46

*Grausz v. Hershey Co.*,
   691 F. Supp. 3d 1178 (S.D. Cal. 2023) .......................................... 34, 36

*Gutierrez v. Johnson & Johnson Consumer, Inc.*,
   2020 U.S. Dist. LEXIS 83556 (S.D. Cal. Apr. 27, 2020) ........................... 36

*Hirsch v. BHS Home Appliances Corp.*,
   2022 U.S. Dist. LEXIS 185050 (C.D. Cal. July 21, 2022) .......................... 49

*Hirsch v. BHS Home Appliances Corp.*,
   No. 8:21-cv-01355 (C.D. Cal.) ....................................................... 49

*Hodsdon v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018) .................................................. 43, 44

*Ill. ex rel. Madigan v. Telemarketing Assocs.*,
   538 U.S. 600 (2003) ........................................................................... 25

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ............................................................ 27

*In re Toyota Motor Corp.*,
   790 F. Supp. 2d 1152 (C.D. Cal. 2011) ..................................... 20, 21

*Isip v. Mercedes-Benz USA, LLC*,
   155 Cal. App. 4th 19 (2007) ........................................................... 46

*Johnson v. Harley-Davidson Motor Co. Grp., LLC*,
   285 F.R.D. 573 (E.D. Cal. 2012) .................................................... 43

*Kavehrad v. Vizio, Inc.*,
   2023 U.S. Dist. LEXIS 46548 (C.D. Cal. Jan. 26, 2023) .......................... 43

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ........................................................... 12

*Koby v. ARS Nat'l Servs.*,

  2010 U.S. Dist. LEXIS 47205 (S.D. Cal. Mar. 29, 2010)...................................25

*Krakauer v. Rec. Equip., Inc.*,

  2024 U.S. Dist. LEXIS 65346 (W.D. Wash. Mar. 29, 2024)...........................17

*Kulp v. Munchkin, Inc.*,

  678 F. Supp. 3d 1158 (C.D. Cal. 2023) ...........................................................43

*Lassen v. Nissan N. Am., Inc.*,

  211 F. Supp. 3d 1267 (C.D. Cal. 2016) ...........................................................20

*Lemus v. Rite Aid Corp.*,

  613 F. Supp. 3d 1269 (C.D. Cal. 2022) ...........................................................42

*Lemus v. Rite Aid Corp.*,

  No. 8:22-cv-253 (C.D. Cal.) ............................................................................42

*Lorillard Tobacco Co. v. Reilly*,

  533 U.S. 525 (2001) ........................................................................................25

*Mazza v. Am. Honda Motor Co.*,

  666 F.3d 581 (9th Cir. 2012) ...........................................................................22

*McCarthy v. Toyota Motor Corp.*,

  2019 U.S. Dist. LEXIS 129207 (C.D. Cal. Apr. 9, 2019) ...............................41

*Mexia v. Rinker Boat Co., Inc.*,

  174 Cal. App. 4th 1297 (2009) ........................................................................46

*Milan v. Clif Bar & Co.*,

  489 F. Supp. 3d 1004 (N.D. Cal. 2020)......................................................23, 24

*Mosqueda v. Am. Honda Motor Co.*,

  443 F. Supp. 3d 1115 (C.D. Cal. 2020) ...........................................................43

*Nat'l Abortion Fedn. v. Ctr. for Med. Progress*,

  2018 U.S. Dist. LEXIS 190887 (N.D. Cal. Nov. 7, 2018)...............................27

*Nat'l Ass'n of Wheat Growers v. Bonta*,

  85 F.4th 1263 (9th Cir. 2023) ............................................28, 29, 30, 31

*Neubronner v. Milken,*

  6 F.3d 666 (9th Cir. 1993) ................................................................ 42

*Oddo v. United Techs. Corp.,*

  2022 U.S. Dist. LEXIS 25048 (C.D. Cal. Jan. 3, 2022) ...................... 43

*Oltman v. Holland Am. Line-USA, Inc.,*

  538 F.3d 1271 (9th Cir. 2008) .......................................................... 49

*Opperman v. Path, Inc.,*

  87 F. Supp. 3d 1018 (N.D. Cal. 2014) .............................................. 21

*Parker v. Alexander Marine Co.,*

  2015 U.S. Dist. LEXIS 191665 (C.D. Cal. May 26, 2015) ................. 48

*Perez v. Bath & Body Works, LLC,*

  2023 U.S. Dist. LEXIS 84891 (N.D. Cal. May 15, 2023) .............. 23, 24

*Planned Parenthood Fed'n of Am., Inc. v. Newman,*

  51 F.4th 1125 (9th Cir. 2022) ....................................................... 26, 27

*Reyes v. Beneficial State Bank,*

  76 Cal. App. 5th 596 (2022) .............................................................. 37

*Rodriguez v. Endangered Species Chocolate, LLC,*

  2024 U.S. Dist. LEXIS 64282 (S.D. Cal. Mar. 18, 2024) ............... 35, 37

*Rodriguez v. Endangered Species Chocolate, LLC,*

  No. 23-cv-00054 (S.D Cal.) ............................................................... 37

*Rodriguez v. Equal Exch., Inc.,*

  2024 U.S. Dist. LEXIS 58982 (S.D. Cal. Mar. 31, 2024) ....... 19, 32, 34, 35

*Rodriguez v. Mondelez Glob. LLC,*

  2023 U.S. Dist. LEXIS 209462 (S.D. Cal. Nov. 22, 2023) .................. 34

*Rouze v. One World Techs.,*

  2021 U.S. Dist. LEXIS 220495 (E.D. Cal. Nov. 12, 2021) ................. 46

*Safeco Ins. Co. of Am. v. Cty. of San Bernardino,*

  2006 U.S. Dist. LEXIS 98789 (C.D. Cal. Oct. 5, 2006) ...................... 37

*Sciortino v. PepsiCo, Inc.*,
    108 F. Supp. 3d 780 (N.D. Cal. 2015)............................................................ 32, 35, 36

*SEC v. Montano*,
    2020 U.S. Dist. LEXIS 173149 (M.D. Fla. July 24, 2020) ................................26

*Silviera v. GM, LLC*,
    2023 Cal. Super. LEXIS 82358 (Cal. Super. Ct. Oct. 23, 2023)......................43

*Sloan v. GM, LLC*,
    287 F. Supp. 3d 840 (N.D. Cal. 2018)..............................................................46

*Smith v. Keurig Green Mt., Inc.*,
    393 F. Supp. 3d 837 (N.D. Cal. 2019)..........................................................26, 30

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..........................................................................................27

*Solis v. Coty, Inc.*,
    2023 U.S. Dist. LEXIS 38278 (S.D. Cal. Mar. 7, 2023) ..................................17

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ..........................................................................................27

*Steele v. GM LLC*,
    2018 U.S. Dist. LEXIS 226965 (C.D. Cal. Aug. 8, 2018) ................................43

*United States SEC v. Pirate Inv'r LLC*,
    580 F.3d 233 (4th Cir. 2009) ............................................................................25

*United States v. Hempfling*,
    431 F. Supp. 2d 1069 (E.D. Cal. 2006) ............................................................26

*Villanueva v. Am. Honda Motor Co.*,
    2019 U.S. Dist. LEXIS 228428 (C.D. Cal. Oct. 10, 2019) ...............................43

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*,
    471 U.S. 626 (1985) ..........................................................................................25

*Zurba v. FCA United States LLC*,
    2022 U.S. Dist. LEXIS 219137 (C.D. Cal. Nov. 10, 2022) ..............................43

**Statutes**

42 U.S.C. § 6291(4)........................................................................................40

42 U.S.C. § 6291(5)........................................................................................41

42 U.S.C. § 6297(a)........................................................................................40

42 U.S.C. § 6297(c)........................................................................................39

42 U.S.C. § 6297(d)...................................................................................39, 40

810 Ill. Comp. Stat. 5/2A-214(2).....................................................................48

Cal. Civ. Code § 1717.....................................................................................37

Cal. Civ. Code § 1791.1(a).............................................................................46

Cal. Civ. Code § 1792.....................................................................................48

Cal. Civ. Code § 1793.....................................................................................47

Cal. Civ. Code § 3924(a)................................................................................49

Cal. Com. Code § 2316...................................................................................48

Cal. Health & Safety Code § 25249.6....................................................31, 32, 33

**Regulations**

Cal. Code Regs. Tit. 27, § 27001.....................................................................33

## I.    Introduction.

In May, this Court issued a well-reasoned order rejecting most of Defendants' arguments for dismissal.  Defendants' present motion largely asks the Court to reconsider that prior order, without setting forth any proper grounds for reconsideration.[1]  Plaintiffs' allegations relevant to the issues they won on previously have not materially changed.  Nor do Defendants point to any material change in law since the Court's prior order.  Defendants simply repeat the same arguments that the Court already considered and rejected.  The Court should reject them again.

Defendants contend that "this litigation has changed markedly" because Plaintiffs "pivot[ed] to a warning theory" from a must-redesign theory.  Mot. 14.  This is wrong.  Plaintiffs' theory has always been that Defendants' wrongful conduct is selling unsafe stoves without a warning.  Defendants could cure that wrongful conduct either by making their stoves safe, or by adding a warning.  How Defendants bring themselves into compliance with the law is up to them.  Nothing about that has changed since Defendants' prior motions to dismiss.

Defendants also make two new arguments that they could have raised—but did not—in their prior motions to dismiss, invoking the First Amendment and Proposition 65.  For the reasons explained below, these arguments lack merit.

Finally, Plaintiffs' amended complaints add detailed allegations in two areas where the Court found the prior complaints lacking: standing to seek injunctive relief, and punitive damages.  The amended complaints adequately plead these issues.

---

[1] "A motion for reconsideration of an Order on any motion or application may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered.  No motion for reconsideration may in any manner repeat any oral or written argument made in support of, or in opposition to, the original motion."  Civ. L.R. 7-18.

## II.    Plaintiffs plausibly allege that Defendants' gas stoves emit hazardous levels of pollutants, as this Court correctly held.

This Court previously held that Plaintiffs' "allegations 'offer detailed, non-conclusory factual allegations of the [alleged] product defect' in Defendants' gas stoves." Op. 10; *see* Op. 16, 21, 23.[2]  Those allegations have not changed.  Yet once again, Defendants ask the Court to ignore the complaints' well-pleaded allegations and instead engage in a comprehensive critique of the scientific literature on gas stove emissions from the 1980s to today, resolving competing views on how to interpret the results of scientific studies, as well as the reliability of those studies' methods.  And Defendants ask the Court to do this without any input at all from experts in the field, based purely on the non-scientific understandings of Defendants' attorneys.  As the Court held previously, this goes well beyond the permissible bounds of a motion to dismiss.  Op. 16; *see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018) (reaffirming "the prohibition against resolving factual disputes at the pleading stage").

Moreover, the scientific literature overwhelmingly confirms the plausibility of Plaintiffs' allegations.  "[S]tudies dating back decades have shown harmful effects from the $NO_2$ in gas cooking stoves."  H/G ¶ 25; N ¶ 26; Doble Decl. Ex. 1.  By the early 1980s, studies had observed "gas-range emissions of CO, $NO_2$, and formaldehyde that approached or exceeded ambient air-quality guidelines for outdoor air."  Doble Decl. Ex. 2 at 29.  This caused the gas stove industry—fearful of regulation—to research ways to reduce emissions of harmful pollutants from gas stove burners.  *Id.* at 28-29.  In 1986, although there was at that time not enough data to be certain of the health effects, an EPA report found that "[h]ealth effects data from epidemiological studies in gas stove homes suggest that young children are at increased risk of respiratory symptoms and infection from exposure to elevated concentrations of $NO_2$" and that "[o]ther groups at risk to $NO_2$ exposure are asthmatics and bronchitics."  Doble Decl. Ex. 3 at 5.

---

[2] Plaintiffs adopt Defendants' shorthand for documents filed in this case ("Op." for the Court's prior order, and "H", "G", and "N" for the amended complaints).

Later studies confirmed the health risks of pollutant emissions from gas stoves. In 1992, researchers from Duke University and the EPA performed a meta-analysis of previous studies. Doble Decl. Ex. 4 at 662. They observed that previous "[s]tudies that examine[d] $NO_2$ relationships to respiratory illness, when reviewed independently, produce somewhat mixed results." *Id.* at 664. But when they combined and synthesized the data from these studies using three different methods, "the conclusion from all three methods [was] that the increase in the odds of respiratory illness in children exposed to a long-term increase of 30 $\mu g/m^3$ (comparable to the increase resulting from exposure to a gas stove) is about 20 percent." *Id.* at 662. In other words, $NO_2$ exposure from a gas stove increases the likelihood of respiratory illness in children by 20 percent. The researchers concluded that "[t]he evidence for effects on respiratory illness in children under age 12 is clearly very strong." *Id.* at 668. Moreover, the 20 percent increase in the likelihood of respiratory illness was "likely to be an underestimate." *Id.* at 669.

A 2008 study from John Hopkins University further linked household nitrogen dioxide exposure to respiratory effects. Doble Decl. Ex. 5 at 1428. Monitoring of household nitrogen dioxide concentrations and asthma symptoms "show[ed] a consistent link between increased $NO_2$ concentrations and increased respiratory symptoms in preschool children with asthma." *Id.* at 1431. "$NO_2$ concentrations were higher in homes with a gas stove … compared with those without a gas stove," and "[h]igher $NO_2$ concentrations were associated with statistically significant increases in respiratory symptoms." *Id.* at 1430. Moreover, "[t]he link between indoor $NO_2$ concentrations and asthma symptoms appear[ed] to be robust, because the associations were not significantly affected by the potential confounders studied." *Id.* at 1431.

In 2013, another meta-study "extracted data from 41 studies published since 1977 assessing the relationship between household $NO_2$ or gas cooking and asthma and wheeze." Doble Decl. Ex. 6 at 1727. That analysis showed that "children living in a home with gas cooking have a 42% increased risk of having current asthma, a 24% increased risk of lifetime asthma and an overall 32% increased risk of having current and

lifetime asthma," and also that "per 15 ppb increase in indoor $NO_2$ level, children have a 15% increased risk of having current wheeze." *Id.* at 1728-31. A 2014 WHO report cited this study in reporting that "[t]he most recent and comprehensive systematic review and meta-analysis of this topic" "found that household gas cooking was associated with significantly increased odds of current asthma … and lifetime asthma … in children." Doble Decl. Ex. 7 at 76, 78.

In 2016, EPA research determined that "[e]vidence for asthma attacks supports a causal relationship between short-term $NO_2$ exposure and respiratory effects." Doble Decl. Ex. 8 at 1xxxvii. The EPA reached this conclusion based on evidence from "controlled human exposures studies." *Id.* at 1xxxiii. It also observed that evidence "indicates that repeated short-term $NO_2$ exposure could lead to the development of asthma." *Id.* at 1xxxv. In addition, the EPA concluded that "[t]here is likely to be a causal relationship between long-term $NO_2$ exposure and respiratory effects based on the evidence for development of asthma." *Id.* at 1xxxiv. It noted that "recent studies consistently observe $NO_2$-related increases in asthma development in children who are followed over time and are supported by previous experimental studies." *Id.*

More recent studies provide further confirmation of the link between gas stoves and health risks. A study published in January 2022 measured nitrogen oxide emissions from gas stoves in a controlled setting, and found that "total $NO_x$ emissions were directly proportional to the rate of natural gas combustion." Doble Decl. Ex. 9 at 2534. The data showed that nitrogen dioxide levels "can surpass the 1-h national standard of $NO_2$ … within a few minutes of stove usage." *Id.* at 2529. Moreover, the researchers "found no evidence of a relationship between either the age of the stove or purchase price of the stove … with $NO_x$ emissions." *Id.* at 2537. The stoves emitted nitrogen oxides at the same rate, regardless of the age or price of the stove.

Defendants critique the methodology of this study because it measured emissions "by containing the stove 'in an airtight portion of the room … by hanging plastic sheets,'" and most consumers do not hang plastic sheets in their kitchens. Mot. 18. But

14

lawyers critiquing the methodology of peer-reviewed scientific studies is not a proper use of a motion to dismiss. Moreover, Defendants' critique completely misses the point of the study. The researchers sealed the testing areas to ensure that they would get accurate readings of emissions from the gas stoves, without interference from other factors. Doble Decl. Ex. 9, at 2530. This is good scientific practice, not a flaw in methodology. By their nature, scientific experiments obtain data in controlled settings, and then use that information to formulate conclusions and recommendations about the real world. Here, the data showed that nitrogen dioxide emissions are directly proportional to the amount of gas burned by a gas stove. And that combustion produces the same amount of nitrogen dioxide, whether or not there are plastic sheets hanging in the kitchen.

Defendants also fault the study because it did not specify the brands of gas stoves that it tested. Mot. 18, 21. The study measured emissions from "18 unique brands" at 53 homes. Doble Decl. Ex. 9 at 2530. Setting aside the plausible inference that Defendants (as major players in the gas stove industry) were among the 18 brands tested, there is every reason to draw the plausible inference that Defendants' gas stoves—like those tested—release nitrogen dioxide emissions in proportion to the amount of gas burned. *See Khoja*, 899 F.3d at 1003 ("At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.") (quote omitted). Indeed, as described above, the researchers found no difference in emissions based on the age or purchase price of the stove, which strongly suggests that Defendants' stoves emit nitrogen dioxide in the same way.

Another study published in 2022 concluded that "12.7% of current childhood asthma nationwide is attributed to gas stove use." Doble Decl. Ex. 10, at 3. The authors of that study observed that their "results align with a cross-sectional study which found that the use of a gas stove or oven for heat was a main risk factor for doctor-diagnosed asthma in US children under age six." *Id.*

Most recently, a study published in May 2024 found, "[c]onsistent with previous research, … that combustion from gas and propane stoves represents a major source of

long- and short-term $NO_2$ exposure that can exceed U.S. and WHO guidelines just by
using a stove, independent of any outdoor $NO_2$ exposures." Doble Decl. Ex. 11 at 7.
Like the 2022 study, the data showed that "[n]itrogen dioxide emissions … scaled
linearly with the amount of fuel burned." *Id.* at 2. The "[e]stimates of $NO_2$ emission
factors calculated from the 50 gas stoves measured newly in this work were statistically
identical to the emission factors measured previously for 32 gas stoves by [the 2022
study]." *Id.* The data showed that "gas and propane stoves in the United States elevate
long- and short-term $NO_2$ exposure substantially." *Id.* at 3. Based on sophisticated
population modeling, the authors estimated that "gas and propane stoves may contribute
up to 19,000 adult deaths annually in the United States, and that "long-term $NO_2$
exposure from gas and propane stoves is responsible for approximately 50,000 current
cases of pediatric asthma," with "the total number of current pediatric asthma cases
attributable to pollution from gas and propane stoves … likely closer to 200,000." *Id.* at
7. Finally, because this study "assessed only one pollutant, $NO_2$," its "estimates of
disease burden and societal cost almost certainly underestimate the full health
consequences of combustion from gas and propane stoves." *Id.*

The scientific literature demonstrating the connections between gas stove use,
nitrogen dioxide emissions, and health effects has resulted in a consensus among
scientists, public-health organizations, and regulators that nitrogen dioxide emissions
from gas stoves pose risks to human health. The American Medical Association issued a
resolution "recogniz[ing] the association between the use of gas stoves, indoor nitrogen
dioxide levels and asthma," and "that use of a gas stove increases household air pollution
and the risk of childhood asthma and asthma severity." H/G ¶ 23; N ¶ 22; Doble Decl.
Ex. 12. And the EPA, consistent with its 2016 findings, advises: "Breathing air with a
high concentration of $NO_2$ can irritate airways in the human respiratory system. Such
exposures over short periods can aggravate respiratory diseases, particularly asthma,
leading to respiratory symptoms (such as coughing, wheezing or difficulty breathing),
hospital admissions and visits to emergency rooms. Longer exposures to elevated

16

concentrations of $NO_2$ may contribute to the development of asthma and potentially increase susceptibility to respiratory infections."  Doble Decl. Ex. 13.

In light of the multitude of scientific studies demonstrating the risk of nitrogen dioxide emissions from gas stoves, as well as agreement from the American Medical Association and EPA that nitrogen dioxide emitted by gas stoves is hazardous to human health, Plaintiffs' allegations fall well beyond the minimal "plausibility" threshold of the *Twombly*/*Iqbal* pleading standard.

Defendants argue that Plaintiffs have failed to plausibly "allege that (1) the ***particular product at issue*** contains some substance, (2) the product contains a certain ***amount*** of that substance, and (3) at that amount, the substance ***causes*** the safety risk." Mot. 20.  Defendants are wrong on all accounts.

To begin, to the extent Defendants argue that plaintiffs are required to specifically test the products they purchased in order to survive a motion to dismiss, Defendants are wrong.  Plaintiffs need only allege facts rendering it plausible that their products suffer from a defect.  *See Castillo v. Prime Hydration LLC*, 2024 U.S. Dist. LEXIS 161851, *6 (N.D. Cal. Sept. 9, 2024) (rejecting as "not persuasive" the argument "that plaintiffs must connect testing to the specific product purchased"); *Solis v. Coty, Inc.*, 2023 U.S. Dist. LEXIS 38278, *32 (S.D. Cal. Mar. 7, 2023) ("Solis need not explicitly allege the unit of Product she purchased actually contained PFAS or that all units of the Product contain PFAS, but may simply aver facts from which this Court can make such reasonable inferences.").  Defendants' own case makes this clear.  *See Krakauer v. Rec. Equip., Inc.*, 2024 U.S. Dist. LEXIS 65346, *17 (W.D. Wash. Mar. 29, 2024) (rejecting the "contention that Krakauer needs to test the actual jacket he purchased for PFAS in order to survive a motion to dismiss for lack of standing"); *id.* at *18 (stating that, in light of the defendant's contentions, the plaintiff "needs to have either tested the same model of jacket he purchased for PFAS *or establish that his jacket is substantially similar* to REI products that contain dangerous PFAS") (emphasis added).

Plaintiffs allege that their gas stoves—like other gas stoves—emit harmful

pollutants when used for their intended purpose of home cooking.  They allege that the "emission of harmful pollutants occurs because when gas stoves are turned on, natural gas combines with oxygen to create a controlled flame for cooking and produces gases like nitric oxide and nitrogen dioxide as byproducts of the combustion."  H ¶ 18; G ¶ 19; N ¶ 17.  And they allege that "[a]ll Defendant[s'] Products emit gases this way when they are used for cooking, because they all use natural gas to create heat for cooking."  *Id.* These allegations are plausible because Defendants' gas stoves combust natural gas to create heat, and this combustion releases nitrogen oxides as a byproduct.  Moreover, the studies described above specifically measured nitrogen dioxide emissions from gas stoves.  That these studies did not specify which brands of gas stoves they tested does not render Plaintiffs' allegations implausible.  It is plausible that Defendants' gas stoves—like the gas stoves tested—also emit nitrogen dioxide when used for cooking, because Defendants' stoves—like the gas stoves tested—also combust natural gas to create heat.  What is implausible is Defendants' suggestion that the laws of physics and chemistry do not apply to their gas stoves.

Plaintiffs also allege that the levels of pollutants emitted by Defendants' gas stoves are unsafe.  They allege that Defendants' gas stoves "emit air pollutants such as nitrogen dioxide, carbon monoxide and fine particulate matter at levels the EPA and World Health Organization have said are unsafe and linked to respiratory illness, cardiovascular problems, cancer, and other health conditions."  H ¶ 17; G ¶ 15; N ¶ 16.  As the Court previously held, these allegations "allege the existence of a design defect, with sufficient particularity at the pleading stage."  Op. 21.  And these allegations are also supported by scientific research.  As described above, studies have shown that nitrogen dioxide emissions are directly proportional to the amount of gas burned and have calculated specific emissions factors.  These results show that using a gas stove for normal cooking can result in exposure to nitrogen dioxide that exceeds U.S. and WHO guidelines.  Moreover, the amount of nitrogen dioxide emitted from gas combustion did not vary by age or purchase price of the stoves, strongly suggesting that Defendants' stoves emit

1  nitrogen dioxide at the same rate.  And this makes sense, because Defendants' gas stoves

2  combust natural gas just like the tested gas stoves.

3       Plaintiffs also allege that the reason the levels of pollutants from Defendants' gas

4  stoves are unsafe is that they can cause adverse health effects, such as asthma and other

5  respiratory illnesses.  Indeed, in 2016 the EPA found that evidence supports causal

6  relationships between both short- and long-term nitrogen dioxide exposure and

7  respiratory effects.  And numerous studies cited above found that gas cooking is linked

8  to asthma and other respiratory effects.  Indeed, the evidence of this link is so strong

9  that researchers have developed sophisticated modeling to estimate the number of

10  deaths and asthma cases nationwide that are attributable to gas stove emissions.

11       This is not a case where Plaintiffs merely allege that their stoves release "some

12  amount" of pollutants, *Grausz v. Hershey Co.*, 2024 U.S. Dist. LEXIS 14237, *14 (S.D.

13  Cal. Jan. 25, 2024), and do not plausibly allege that they emit pollutants "at a level

14  sufficient to cause an injury," *Krakauer*, 2024 U.S. Dist. LEXIS 65346, *18.  Plaintiffs

15  plausibly allege that their stoves emit pollutants *at levels considered unsafe* by regulators and

16  public-health organizations, and support those allegations with scientific studies.  *See, e.g.*,

17  *Rodriguez v. Equal Exch., Inc.*, 2024 U.S. Dist. LEXIS 58982, *23 (S.D. Cal. Mar. 31, 2024)

18  (plaintiff plausibly alleged chocolate bars containing cadmium and lead were unsafe by

19  alleging that "both cadmium and lead pose serious health risks and, with respect to lead

20  specifically, no amount of it is considered safe"); *Castillo*, 2024 U.S. Dist. LEXIS 161851,

21  *8 (declining to resolve "hotly contested issue of fact" whether "the levels of PFAS in

22  Grape Sports Drink are safe" at the pleading stage).

23       In sum, Defendants' attempt to dispute the facts alleged in the complaint (and the

24  science underlying those allegations) once again overwhelmingly fails.  Plaintiffs plausibly

25  allege that Defendants' gas stoves emit unsafe levels of pollutants.

26  **III.  Plaintiffs have Article III standing.**

27      **A.  Plaintiffs plausibly allege injury in fact, as this Court correctly held.**

28  This Court's conclusion that Plaintiffs plausibly alleged injury in fact was correct.

Op. 8-11.  Defendants recycle the same arguments that the Court previously rejected.

Defendants once again rely on language stating that "something more is required than simply alleging an overpayment for a 'defective' product."  Mot. 23.[3]  "[T]hat 'something more' could be allegations based on market forces.  It could *also* be based on sufficiently detailed, non-conclusory allegations of the product defect."  *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1165 n.11 (C.D. Cal. 2011) (emphasis added).  That is, Plaintiffs can allege "something more" *either* by providing detailed allegations of the defect *or* by alleging a decrease in value based on market forces.  The *In re Toyota* court made clear that these are two separate *sufficient* conditions for alleging "something more":

> While factual allegations tying an economic loss to a "market effect" are sufficient to establish an injury for standing purposes, they are not indispensable—even for those Plaintiffs who have not experienced the safety defect.  As long as Plaintiffs do not simply allege that their Toyota vehicles are "defective," but rather offer detailed, non-conclusory factual allegations of the product defect, the economic loss injury flows from the plausibly alleged defect at the pleadings stage.

*Id.* at 1166.  As this Court held previously, Plaintiffs allege "something more" in both ways.  Op. 10-11.

First, Plaintiffs' "allegations 'offer detailed, non-conclusory factual allegations of the [alleged] product defect' in Defendants' gas stoves."  Op. 10 (quoting *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1166).  Plaintiffs allege that Defendants' gas stoves produce unsafe levels of pollutants during normal use.  H ¶¶ 17-28; G ¶¶ 15-28; N ¶¶

---

[3] Defendants also fault the Court for holding that the "inherent" nature of the danger supports standing because, in Defendants' words, "Article III standing jurisprudence never turns on whether the posited issue is 'inherent' or not."  Mot. 24.  But as made clear from the Court's order, the Court's standing analysis did not rest solely on the "inherent" nature of the defect.  Op. 8-11.  That part of the Court's analysis was used to distinguish *Birdsong v. Apple, Inc.*, 590 F.3d 955 (9th Cir. 2009) and *Lassen v. Nissan N. Am., Inc.*, 211 F. Supp. 3d 1267 (C.D. Cal. 2016), on the same basis that numerous other courts have distinguished those cases.  Op. 10.  Defendants do not rely on this aspect of *Birdsong* or *Lassen* in their current motion.

20

16-27.  They allege in detail how this occurs:

> This emission of harmful pollutants occurs because when gas stoves and
> cooktops are turned on, natural gas combines with oxygen to create a
> controlled flame for cooking and produces gases like nitric oxide and
> nitrogen dioxide as a byproduct of the combustion.  All of Defendant[s']
> Products emit gases this way when they are used for cooking, because they
> all use natural gas to create heat for cooking.

H ¶ 18; G ¶ 19; N ¶ 17.  These detailed, non-conclusory allegations of the defect
"plausibly establish an economic loss" because "defective [stoves] are not worth as much
as defect-free [stoves]."  *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1165; *see Opperman v.
Path, Inc.*, 87 F. Supp. 3d 1018, 1040 (N.D. Cal. 2014) ("Plaintiffs' allegations concerning
the offending feature of the product … supply the 'something more' that is required.").[4]

Second, Plaintiffs plausibly allege "something more" based on a market effect by
alleging that "if consumers 'knew the truth,' then Defendants could not sell their
products at the current prices."  Op. 10.  Plaintiffs allege that "in late 2022 and early
2023, media articles reported the potential health risks from gas stoves and, as a result of
those articles, demand for gas stoves has dropped."  Op. 10; *see* H/N ¶¶ 41-45; G ¶¶ 40-
44.  Indeed, a recent study shows that "consumer demand for gas stoves falls as
consumers become informed of the harms of gas stoves."  H/N ¶ 43; G ¶ 42.  Also,
"many jurisdictions are considering, or have even approved, a natural gas appliance ban,
which decreases the demand for gas stoves."  Op. 10; *see* H/N ¶ 44; G ¶ 43.  These
allegations—which Plaintiffs "substantiate" with an "objective basis"—qualify as
"something more" sufficient to confer standing.  *In re Toyota*, 790 F. Supp. 2d at 1166.

Defendants contend that Plaintiffs cannot plausibly allege a market effect because
they have not alleged that there is a "market for used gas cooking appliances."  Mot. 27.

---

[4] In a footnote, Defendants argue that these allegations are inconsistent with
Plaintiffs' allegations that there are safer "[a]lternative gas stove designs."  Mot. 25 n.2.
These allegations are perfectly consistent.  Plaintiffs allege that "Defendant[s] failed to
use an alternative design," so their stoves are unsafe.  H/G/N ¶ 32.

But Plaintiffs are not alleging that their economic harm is the drop in resale value of their stoves on a secondary market.  Their economic harm is that they "overpaid" for Defendants' products when they purchased them new.  H ¶ 62; G ¶ 53; N ¶ 59. Plaintiffs suffer an "injury in fact" when they "pa[y] more" for a product "than they otherwise would have paid." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012), *overruled in part on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).

Defendant also argues that it is "implausible for Plaintiffs to allege a market effect where they claim the alleged 'defect' exists in the entire market." Mot. 28.  For example, in *Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955 (N.D. Cal. 2015), it was "unclear" how a defect would "translate into economic injury" based on a market effect, because all cars on the market had the same defect, leaving no alternative for consumers to select over the defendant's cars.  Here, by contrast, there is a clear alternative in the market for stoves: electric stoves.  If the hazards of gas stoves were disclosed, consumers could "make an informed choice about whether to buy a gas appliance or an electric stove (which does not carry the same risk)."  H/G/N ¶ 2.  And, as just described, the effect on consumer demand has been confirmed by a recent study.  H/N ¶ 43; G ¶ 42.

### B.    Plaintiffs have standing to seek injunctive relief.

Under controlling law, "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018).  In such cases, "the threat of future harm may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Id.* at 969-70.  For example, in *Davidson*, the plaintiff alleged that she "would purchase truly flushable wipes manufactured by [Defendant] if it were possible to determine prior to purchase if the wipes were suitable to be flushed" but "is unable to determine, based on the packaging, whether the wipes are truly flushable." *Id.* at 962.

22

Based on these allegations, the Ninth Circuit held, "[the plaintiff] properly alleged that she faces a threat of imminent or actual harm by not being able to rely on [the Defendant's] labels in the future, and … this harm is sufficient to confer standing to seek injunctive relief." *Id.* at 967.

Plaintiffs allege precisely what was sufficient in *Davidson*. They allege that they "will purchase another stove in the future." H ¶ 64; G ¶ 54; N ¶ 60. That is because a stove's "lifespan is limited," so "consumers like Plaintiffs will replace their stoves several times throughout their lifetimes." *Id.*[5] And Plaintiffs allege that when they purchase their next stoves, they "would purchase Defendant[s'] Products … if the Product was redesigned to avoid emitting harmful pollutants," because they "like Defendant[s'] Products." *Id.* But, absent an injunction, "they cannot rely on any representations from Defendant[s] that the Product is safe for cooking inside the home or the absence of any pollutant warning, and so they will not buy another Product from Defendant[s] even though they would like to do so." *Id.* Thus, Plaintiffs allege a threat of imminent harm because they will not be able to rely on Defendants' labels when purchasing another stove. *Davidson*, 889 F.3d at 967. Under *Davidson*, this is sufficient to seek injunctive relief. *Id.*; *see Milan v. Clif Bar & Co.*, 489 F. Supp. 3d 1004, 1006 (N.D. Cal. 2020) (plaintiffs' allegations "that they would buy Clif Bar products again if the company were honest in its health and wellness claims" were "indistinguishable from those upheld for injunctive relief in *Davidson*"); *Perez v. Bath & Body Works, LLC*, 2023 U.S. Dist. LEXIS 84891, at *12 (N.D. Cal. May 15, 2023) (allegation that plaintiff "continues to want to buy BBW products … [b]ut cannot determine whether the representations on the Products are true" was sufficient to confer standing to seeking injunctive relief).

For the risk to be sufficiently imminent, Plaintiffs need not allege that they presently seek to buy a new stove, or even that they will purchase one in a specific time-frame. In *Davidson*, for example, the plaintiff had no present intention of purchasing the

---

[5] These allegations were not in the prior complaints. *See* Redline H ¶ 64; Redline G ¶ 54; Redline N ¶ 60.

defendant's wipes, because those wipes were not presently flushable.  Instead, her standing was based on the possibility that she would purchase the defendant's wipes at some point "in the future." *Davidson*, 889 F.3d at 967.  There was no precise date that the plaintiff anticipated attempting to purchase the defendant's product again, but that did not render her future injury hypothetical or conjectural. *Id.* Similarly, the plaintiffs in *Milan* and *Perez* alleged that they would purchase the products "in the future," with no specific date. *Milan*, 489 F. Supp. 3d at 1006; *Perez*, 2023 U.S. Dist. LEXIS 84891, at *14.  Here, Plaintiffs make the same allegations that these courts held sufficient: that they "will purchase another stove in the future" and that they "would purchase Defendant[s'] Products in the future if the Product was redesigned to avoid emitting harmful pollutants." H ¶ 64; G ¶ 54; N ¶ 60.

Defendants argue that Plaintiffs "lack standing to seek a warning label because they concede that a warning label is irrelevant to their own future purchasing decisions" by alleging that they will purchase Defendants' gas stoves only if they are redesigned. Mot. 29-30.  This argument misses the point of an injunction.  Under *Davidson*, the risk of "not being able to rely on [the defendant's] labels in the future" confers standing. *Davidson*, 889 F.3d at 967.  "Knowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future"—i.e., Defendants could redesign their gas stoves to be safe. *Id.* at 969.  An injunction ensures that Plaintiffs will know whether Defendants' gas stoves are safe or not when making their next stove purchase.

## IV.    The First Amendment has no bearing on Plaintiffs' claims.

Defendants make the novel argument that their fraudulent failure to warn consumers that their products are unsafe is protected by the First Amendment.[6]  Mot.

---

[6] It is unclear whether Defendants contend that the First Amendment bars Plaintiffs' implied warranty claims, which are not for a failure to warn, but rather for the sale of an unmerchantable product.  Holding Defendants liable for selling an unmerchantable product has nothing at all to do with Defendants' speech interests. Mot.

30-35.  This argument fails for several reasons.  At the outset, Defendants fail to carry their burden of "demonstrat[ing] that the First Amendment even applies" to their conduct.  *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 n.5 (1984).  That is because the First Amendment does not protect fraudulent or misleading conduct, nor does it protect violations of generally applicable laws.  Despite researching federal and state court cases across the country (*see* Mot. 30 n.5), Defendants do not cite a single case applying the First Amendment to bar consumer fraud or implied warranty claims.  And that makes sense, because if the First Amendment applied to such claims, then any company accused of fraudulently omitting material safety risks could claim immunity under the First Amendment.  Moreover, Defendants' First Amendment argument fails on its face under the *Zauderer* standard, and also under the intermediate scrutiny standard that Defendants contend applies.

## A. The First Amendment does not protect fraudulent or misleading conduct.

"[T]he First Amendment does not shield fraud."  *Ill. ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 612 (2003).  "The States and the Federal Government are free to prevent the dissemination of commercial speech that is false, deceptive, or misleading."  *Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 638 (1985).  Accordingly, "the first inquiry is whether the speech is unlawful or misleading.  If it is either, then the commercial speech is not protected at all by the First Amendment."  *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004); *see Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").[7]

---

[7] *See, e.g.*, *United States SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 255 (4th Cir. 2009) ("Punishing fraud, whether it be common law fraud or securities fraud, simply does not violate the First Amendment."); *Koby v. ARS Nat'l Servs.*, 2010 U.S. Dist. LEXIS 47205, *17 (S.D. Cal. Mar. 29, 2010) ("The messages specific to this action are not entitled to constitutional protection because… they are misleading."); *Castle v. Schriro*, 2009 U.S.

For example, in *Smith v. Keurig Green Mt., Inc.*, 393 F. Supp. 3d 837 (N.D. Cal. 2019), the defendant in a consumer class action made the same argument Defendants make here: that the claims were "tantamount to compelling speech by requiring Defendant to change its labeling of the [products], and that such compelled speech violates the First Amendment." *Id.* at 849. The court rejected this argument, finding "no persuasive case law for the principle that a prohibition against deceiving consumers constitutes compelled speech." *Id.*

Here, Plaintiffs allege that Defendants engaged in fraudulent and misleading conduct by failing to disclose to consumers that their products emit harmful levels of pollutants while cooking. The First Amendment does not protect this conduct.

**B.** **The First Amendment does not protect violations of generally applicable laws.**

"[T]he First Amendment does not shield individuals from liability for violations of laws applicable to all members of society." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1134 (9th Cir. 2022); *see Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991) ("The First Amendment does not forbid" the application of laws that are "generally applicable to the daily transactions of all the citizens of" a state.). For example, "[t]he Illinois common law of contracts is a 'law of general applicability' that applies broadly, rather than targeting any individual, and does not offend the First Amendment." *Bennett v. Council 31 of the AFSCME*, 991 F.3d 724, 731 (7th Cir. 2021).

Dist. LEXIS 98473, *12 (D. Ariz. Oct. 21, 2009) ("The statute prevents false or misleading representations, and therefore, does not implicate the First Amendment."); *United States v. Hempfling*, 431 F. Supp. 2d 1069, 1083 (E.D. Cal. 2006) (arguments that the First Amendment protects allegedly fraudulent conduct are "untenable" because "[t]he Supreme Court has repeatedly held that the First Amendment does not shield fraud"); *CFTC v. EOX Holdings L.L.C.*, 2021 U.S. Dist. LEXIS 188090, *117 (S.D. Tex. Sept. 30, 2021) (rejecting argument that "rights to freedom of commercial speech" protected defendants from a claim based on a "failure to disclose," because "the First Amendment does not shield fraud"); *SEC v. Montano*, 2020 U.S. Dist. LEXIS 173149, *13 (M.D. Fla. July 24, 2020) (describing similar argument as "unavailing to the point of near frivolity").

Similarly, "the Minnesota doctrine of promissory estoppel is a law of general applicability" and the First Amendment does not shield defendants from liability for violating it. *Cohen*, 501 U.S. at 670.

By contrast, a law is not generally applicable if it "imposes restrictions 'based on the content of speech and the identity of the speaker.'" *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). Such a law "does not simply have an effect on speech, but is directed at certain content and is aimed at particular speakers." *Sorrell*, 564 U.S. at 567.

Here, Plaintiffs' claims are based on state consumer protection statutes and common law doctrines of fraud, implied warranty, and unjust enrichment. These laws do not "impose[] restrictions 'based on the content of speech and the identity of the speaker.'" *IMDb.com*, 962 F.3d at 1120. They do not single out Defendants or any particular kind of speech (other than speech that is deceptive). To the contrary, they are general laws that are "applicable to all members of society." *Planned Parenthood*, 51 F.4th at 1134; *see Nat'l Abortion Fedn. v. Ctr. for Med. Progress*, 2018 U.S. Dist. LEXIS 190887, *19 (N.D. Cal. Nov. 7, 2018) (rejecting First Amendment defense "because the laws being applied in this case are 'generally' applicable laws, not laws criminalizing speech"). The "compelled speech" that Defendants complain of is "no more than the incidental, and constitutionally insignificant, consequence of applying to [Defendants] a generally applicable law that requires" companies not to deceive consumers and to honor implied warranties. *Cohen*, 501 U.S. at 672.[8]

## C.    Defendants' First Amendment argument fails under *Zauderer*.

For the reasons described above, Defendants fail to meet their burden of showing

---

[8] Sometimes, the First Amendment can bar tort claims if liability "turn[s] on the content and viewpoint of the message conveyed," and that message is "on a matter of public concern." *Snyder v. Phelps*, 562 U.S. 443, 457 (2011). Here, liability does not turn on the content or viewpoint of any message of public concern (except insofar as the contents of Defendants' advertising are deceptive), but rather on Defendants' sales of unsafe kitchen appliances while misleading consumers by failing to disclose the risks.

that Plaintiffs' claims even implicate the First Amendment.  *See supra* §§ IV.A-B.  Their
First Amendment argument also fails because Plaintiffs' claims satisfy the *Zauderer* test.

"Under *Zauderer*, compelled disclosure of commercial speech complies with the
First Amendment if the information in the disclosure is reasonably related to a
substantial governmental interest and is purely factual and uncontroversial."  *CTIA - The
Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019).  A warning about the
danger of pollutants from Defendants' gas stoves is all three.

Such a warning is reasonably related to a substantial governmental interest,
because it would protect the health and safety of consumers and prevent consumer
deception.  *See, e.g.*, *id.* ("There is no question that protecting the health and safety of
consumers is a substantial governmental interest.").  Defendants do not contend that
such a warning is not reasonably related to a substantial governmental interest.  *See* Mot.
33-35 (arguing only that the warning would not survive intermediate scrutiny).[9]

Such a warning is also purely factual, because Plaintiffs plausibly allege that
Defendants' gas stoves emit hazardous levels of pollutants while cooking.  Defendants
again dispute the science underlying these allegations.  Mot 32.  But for the reasons
described above, this approach is both improper at the pleading stage and wrong in light
of the substantial scientific evidence linking gas stoves to health risks.  *See supra* § II.

Defendants' argument that a warning is controversial fails for the same reason.
*See CTIA*, 928 F.3d at 848 ("Because we have determined that the disclosure is factual
and not misleading, we reject CTIA's argument that the disclosure is controversial.").
"'[U]ncontroversial' does not mean 'unanimous.'"  *Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263, 1278 (9th Cir. 2023).  And here, Defendants have not pointed to anything
close to the "robust disagreement by reputable scientific sources" that rendered the
warnings controversial in *Bonta* and *Cal. Chamber of Commerce v. Council for Educ. & Rsch. on
Toxics*, 29 F.4th 468 (9th Cir. 2022) ("*CERT*").  In *Bonta*, one entity was "essentially

---

[9] Nor do Defendants argue that such a warning would be "unjustified or unduly
burdensome" under *Zauderer*.  Mot. 31.

alone in its determination that glyphosate is probably carcinogenic to humans, while EPA, OEHHA, and regulators from around the world conclude that it is not." *Bonta*, 85 F.4th at 1278; *see id.* at 1270 ("[W]hile IARC deems glyphosate 'probably carcinogenic to humans,' as the district court observed, 'apparently all other regulatory and governmental bodies have found the opposite.'"). In *CERT*, the American Cancer Society, the National Cancer Institute, and a published review of epidemiological studies had all concluded that the substance at issue was not likely to cause cancer in humans. *CERT*, 29 F.4th at 478.

Here, Defendants have not identified any such robust disagreement. To the contrary, there is a strong consensus among scientists, regulators, and public-health organizations that the pollutants emitted from Defendants' stoves can cause harmful health effects. *See supra* § II. That this consensus developed over time, and that some of the earlier studies produced seemingly inconsistent results when viewed individually, does not constitute the kind of "robust disagreement" that renders warnings controversial—much less so at the pleading stage.

Defendants also argue that a warning is controversial "because it would require Defendants to take 'sides in a heated political controversy.'" Mot. 33 (quoting *CTIA*, 928 F.3d at 845). But the political controversy that Defendants refer to is not about whether gas stoves emit harmful pollutants (a factual question whose truth value does not depend on politics). It is about whether, in light of these risks, gas stoves should be banned or more heavily regulated.[10] And it is not the law that "any purely factual statement that can be tied in some way to a controversial issue is, for that reason alone, controversial." *CTIA*, 928 F.3d at 845. A warning disclosing that Defendants' gas stoves emit harmful levels of pollutants (a scientific fact) would not take a side on

---

[10] In the news articles that Defendants quote from, the "Washington politics" and "culture war" referenced are about "the idea of banning natural gas cooking stoves" and "regulating gas stoves," including "banning sales of new gas stoves"—not about the scientific consensus that gas stoves emit harmful pollutants. Doble Decl. Exs. 14, 15.

whether gas stoves should be banned or more heavily regulated (a political issue).

Defendants rely heavily on *Bonta*. That reliance is misplaced for three reasons. First, *Bonta* did not involve deceptive conduct or claims under generally applicable laws, but rather involved a legislatively mandated warning requiring specific content. *Bonta*, 85 F.4th at 1266; *see supra* §§ IV.A-B. Second, as just described, in *Bonta* there was "robust disagreement about the carcinogenicity of glyphosate," which rendered the warning both inaccurate and controversial. *Bonta*, 85 F.4th at 1270-71. Here, there is no such "robust disagreement" about the harmful effects of gas stove pollutants. Third, *Bonta* was decided on summary judgment. *Id.* at 1274. Here, at the pleading stage, Defendants' arguments are "unwarranted when taking all facts alleged in the complaint as true." *Smith*, 393 F. Supp. 3d at 849.

### D. Defendants' First Amendment argument also fails under intermediate scrutiny.

Under intermediate scrutiny—which applies in the absence of *Zauderer*—a government may compel commercial speech if "(1) it directly advances a substantial governmental interest, and (2) the restriction is not more extensive than necessary to serve that interest." *Bonta*, 85 F.4th at 1282-83. Here, a warning meets both elements.

Defendants concede that a state "has a substantial interest in preserving the health of its citizens." Mot. 34 (quoting *Bonta*, 85 F.4th at 1283). In addition, a state "has a substantial interest in protecting consumers from misleading advertising." *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1108 (applying intermediate scrutiny in the alternative after determining that the First Amendment did not protect the misleading conduct at issue); *see Edenfield v. Fane*, 507 U.S. 761, 769 (1993) ("[T]here is no question that [a state's] interest in ensuring the accuracy of commercial information in the market-place is substantial."). Here, a warning about pollutant emissions directly advances both those interests by preventing consumer deception and ensuring that consumers purchasing gas stoves are adequately informed of the health risks. Defendants again merely dispute the science, which fails for the reasons described above. Mot. 34; *see supra* § II.

30

In determining whether a restriction "is not more extensive than necessary," courts "do not require that it be the least restrictive means available." *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1111. "Rather, what is required is 'a reasonable fit between the legislature's ends and the means chosen to accomplish those ends.'" *Id.* (quoting *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 632 (1995)). Here, a warning at the point of sale is a reasonable fit for ensuring that consumers are aware of the risks of gas stove pollutant emissions. Defendants argue that "the government 'could reasonably post information about [the purported health risks] on its own website or conduct an advertising campaign.'" Mot. 34 (quoting *Bonta*, 85 F.4th at 1283). But a government may "choose between narrowly tailored means of regulating commercial speech." *Am. Acad. of Pain Mgmt.*, 353 F.3d at 1111. In any event, posting information on the state's own website or conducting an advertising campaign would inform fewer consumers than including a warning at the point of sale, which all purchasers of gas stoves would see. And, unlike in *Bonta*, this is not a situation where one state has a "minority" view on the health risks, such that a single-state information campaign would be sufficient to get that minority view across. *Bonta*, 85 F.4th at 1283.

**V.    Proposition 65's notice requirement does not bar Plaintiffs' claims.**

Defendants raise a new argument based on the notice provision of Proposition 65, after one of their competitors had some success with a similar argument in a different district. *Drake v. Haier US Appliance Sols. Inc.*, 2024 U.S. Dist. LEXIS 25169, *23-26 (N.D. Cal. Feb. 13, 2024). Respectfully, the *Drake* court got this issue wrong. Proposition 65's notice provision does not apply to claims that arise independently from Proposition 65—i.e., claims based on an unlisted pollutant, non-covered health risks, or independent legal obligations. Plaintiffs' claims arise independently for all three reasons.

Proposition 65 states that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual." Cal. Health & Safety Code § 25249.6. It authorizes private suits for

violations, and contains a notice requirement for "[a]ctions pursuant to this section." *Id.* § 25249.7(d). To ensure that this notice requirement carries meaningful effect, "courts have held that plaintiffs cannot plead around the notice requirement by characterizing their [Proposition 65] claim as a UCL claim." *Sciortino v. PepsiCo, Inc.*, 108 F. Supp. 3d 780, 789 (N.D. Cal. 2015).

In authorizing private suits "pursuant to this section", the legislature did not implicitly graft the notice requirement onto other causes of action existing independently of Proposition 65. Indeed, such a result would "frustrate the purpose of Proposition 65 itself, which was 'designed to protect the public.'" *Rodriguez v. Equal Exch., Inc.*, 2024 U.S. Dist. LEXIS 58982, *17 (S.D. Cal. Mar. 31, 2024) (quoting *Ctr. for Self-Improvement & Cmty. Dev. v. Lennar Corp.*, 173 Cal. App. 4th 1543, 1551 (2009)). Applying Proposition 65's notice requirements to bar claims that exist independent of Proposition 65 "would be protecting the manufacturer at the *detriment* of the public—and without any authorizing language in Proposition 65 justifying such an expansive result." *Id.* at *18. Accordingly, the application of Proposition 65's notice provision to other claims is "rather narrow." *Sciortino*, 108 F. Supp. 3d at 793 (quoting *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000)).

"The question is whether the claims … are entirely derivative of an unspoken Proposition 65 violation, or whether they assert claims independent of Proposition 65." *Id.* at 792. A claim is "entirely derivative" of a Proposition 65 violation if it is "totally dependent on establishing a Proposition 65 violation." *Id.* at 793. By contrast, a claim is "independent of Proposition 65" if it is possible to prove that claim without establishing a Proposition 65 violation. *Id.* at 794.

This means that a claim that is based on conduct "related to Proposition 65" nevertheless independently states a claim as long as it is not "based … literally upon a violation of Proposition 65." *Id.* Similarly, a claim is not "entirely derivative" of Proposition 65 merely because the complaint refers to cancer-causing chemicals, or even to Proposition 65 itself. *Id.* at 793-94. For example, in *Sciortino*, the court held that

Proposition 65 did not bar a plaintiff's claims even though the complaint "refer[red] to Proposition 65 repeatedly in support of her claims" and "alleged that '[d]uring the Class Period, Pepsico knowingly and actively concealed the material fact that the Pepsi Beverages contain the toxic and cancer-causing chemical known as [4-MeI] at levels above the safety threshold set by the State of California in Proposition 65.'"  *Id.*  The plaintiff's claims were nonetheless independent because they did not totally depend on proving a violation of Proposition 65.  *Id.*

For several reasons, Plaintiffs' claims are not entirely derivative of a Proposition 65 violation, but rather state claims independently of Proposition 65.

First, Plaintiffs state claims based on the dangers of nitrogen dioxide, which is not a Proposition 65-listed chemical.  The chemicals subject to Proposition 65 are specifically listed in the applicable regulations.  Cal. Code Regs. Tit. 27, § 27001. Nitrogen dioxide is not listed.  *Id.*  So claims based on the harmful effects of nitrogen dioxide cannot possibly be entirely derivative of a Proposition 65 violation, because Proposition 65 does not require warnings about nitrogen dioxide.

Plaintiffs allege that Defendants' gas stoves emit pollutants, "especially nitrogen dioxide," at unhealthy levels.  H ¶¶ 53, 56, 59; G ¶¶ 49, 60; N ¶¶ 52, 55; *see* H ¶ 18; G ¶ 16; N ¶ 17 ("In particular, nitrogen oxides (sometimes written as NOx or NO2), are hazardous to human health."); *see* H ¶¶ 17-28; G ¶¶ 15-28; N ¶¶ 16-27 (describing studies showing that gas stoves emit nitrogen dioxide, and that nitrogen dioxide exposure is linked to asthma and other diseases).  Plaintiffs allege that Defendants "should have, but did not, warn consumers of the risk of nitrogen oxides."  H/G/N ¶ 35.  So Plaintiffs state claims based on the undisclosed safety risk posed by Defendants' products' emissions of nitrogen dioxide.

Second, Plaintiffs state claims based on health hazards that are not covered by Proposition 65.  Proposition 65 is concerned only with warnings about "cancer or reproductive toxicity."  Cal. Health & Safety Code § 25249.6.  Numerous courts have held that a claim is not "entirely derivative" of Proposition 65 if it alleges health risks

separate from cancer and reproductive toxicity.  For example, in *Rodriguez v. Equal Exch., Inc.*, 2024 U.S. Dist. LEXIS 58982 (S.D. Cal. Mar. 31, 2024), the plaintiff alleged that the presence of lead and cadmium in the defendant's products created a risk of cancer and reproductive toxicity, as well as other health problems "outside the law's ambit, such as 'irreversible damage to brain development, liver, kidneys, and bones.'"  *Id.* at *14-15. The court held that Proposition 65 barred the claims only to the extent they were about cancer and reproductive toxicity.  *Id.* at *14.  It did not bar the claims to the extent they were about other health risks from the same chemicals.  *Id.* at *14-18.  As the court reasoned, "Proposition 65 doesn't require warnings about these other risks—like brain and bone damage—nor does it set chemical-threshold standards for such warnings.  So, a suit alleging a failure to warn about these risks isn't a Proposition 65 action in disguise."  *Id.* at *16.  Simply put, "Proposition 65's notice requirement and safe-harbor provision do not apply to claims regarding noxious ills beyond cancer and reproductive toxicity," so "Proposition 65 does not bar consideration of the issue."  *Id.* at *18.

Other courts are in agreement that Proposition 65 does not bar claims to the extent those claims are based on health risks other than cancer and reproductive toxicity. *See Rodriguez v. Mondelez Glob. LLC*, 2023 U.S. Dist. LEXIS 209462, *21-22 (S.D. Cal. Nov. 22, 2023) (Proposition 65 did not bar claims based on allegations that "lead and cadmium can cause 'irreversible damage to brain development, liver, kidneys, and bones, and other health problems'" because "[t]hese alleged harms are outside the scope of Proposition 65"); *Barnes v. Nat. Organics, Inc.*, 2022 U.S. Dist. LEXIS 169864, *14 (C.D. Cal. Sept. 13, 2022) (Proposition 65 did not bar claims "alleg[ing] that Heavy Metal consumption can contribute to a variety of health complications in addition to those that are the focus of Proposition 65 (cancer and reproductive harm)"); *Bland v. Sequel Nat.*, 2019 U.S. Dist. LEXIS 232738, *12 (N.D. Cal. Jan. 18, 2019) (Proposition 65 did not bar claims alleging "risks that fall outside the scope of Proposition 65"); *Grausz v. Hershey Co.*, 691 F. Supp. 3d 1178, 1191 (S.D. Cal. 2023) (same).  Each of these cases involved allegations that the Proposition 65-listed chemicals at issue caused cancer or

reproductive toxicity.  But because the plaintiffs alleged that the same chemicals *also* caused other harms not covered by Proposition 65, at least part of the claims survived.

Here, Plaintiffs' claims are even less connected to Proposition 65.  Plaintiffs allege that the nitrogen dioxide emitted by Defendants' gas stoves contributes to a variety of health issues that are not cancer or reproductive toxicity, including "respiratory illness, cardiovascular problems," "asthma and other lung diseases," "diabetes," and "reduced cognitive performance."  H ¶¶ 1, 19; G ¶¶ 1, 17; N ¶¶ 1, 18.  Because these harms are not covered by Proposition 65, Plaintiffs' claims based on these harms are not entirely derivative of Proposition 65.  *See* cases cited above.  And, unlike the cases cited above, Plaintiffs allege that these non-covered harms are caused by an unlisted pollutant (nitrogen dioxide), so Plaintiffs' claims are even more independent of Proposition 65.

Defendants cite only one case holding that allegations concerning non-covered health outcomes are barred by Proposition 65.  Mot. 37 (citing *Rodriguez v. Endangered Species Chocolate, LLC*, 2024 U.S. Dist. LEXIS 64282, at *9 (S.D. Cal. Mar. 18, 2024)).  The *Rodriguez v. Equal Exchange* court considered this outlier case and determined that the "wisdom" of the numerous other cases declining to apply Proposition 65 to non-covered harms, along with guidance from the California Supreme Court and the protective purpose of Proposition 65 itself, outweighed this lone case reaching the opposite conclusion.  *Rodriguez v. Equal Exch., Inc.*, 2024 U.S. Dist. LEXIS 58982, *17-18.  In any event, that outlier case considered "other negative health outcomes" caused by "*toxins governed by P65*."  *Rodriguez v. Endangered Species Chocolate, LLC*, 2024 U.S. Dist. LEXIS 64282, at *9 (emphasis added).  Here, Plaintiffs' claims involve non-covered harms caused by an *unlisted pollutant*, so Proposition 65 is doubly inapplicable.

Third, Plaintiffs bring claims arising out of wrongs separate from a failure to warn under Proposition 65.  Courts consistently hold that Proposition 65's notice requirement does not apply to wrongs based on separate conduct.  For example, in *Sciortino*, Proposition 65 did not bar a misrepresentation claim because, "[w]hile the alleged misstatement [was] related to Proposition 65, the alleged wrong [was] not a failure to

warn under Proposition 65, but rather a separate misrepresentation to consumers." *Sciortino*, 108 F. Supp. 3d at 794.  Similarly, in *Bland*, "[t]he complaint allege[d] at various points that Defendants' failure to disclose the lead and cadmium content in their products was unlawful and misleading because they marketed these powders and shakes as healthy food products, and because the products posed a hidden health risk." *Bland*, 2019 U.S. Dist. LEXIS 232738, *11.  Proposition 65 did not bar these claims because, "like in *Sciortino*, the 'alleged wrong is not a failure to warn under Proposition 65, but rather a separate misrepresentation to consumers regarding' the presence of potentially dangerous chemicals in Defendants' food products." *Id.*  Numerous other cases have applied this same reasoning to hold that Proposition 65 does not bar claims based on an independent legal obligation.  *See Barnes*, 2022 U.S. Dist. LEXIS 169864, *14; *Grausz*, 691 F. Supp. 3d at 1191, *Gutierrez v. Johnson & Johnson Consumer, Inc.*, 2020 U.S. Dist. LEXIS 83556, *19-20 (S.D. Cal. Apr. 27, 2020).

Here, like in these cases, Plaintiffs allege that Defendants' failure to disclose the health risks from their gas stoves was unlawful and misleading because they marketed their gas stoves as safe and fit for home cooking, and because the gas stoves posed a hidden health risk.  H/N ¶ 39; G ¶ 38.  Plaintiffs also allege that Defendants' failure to disclose was unlawful and misleading because Defendant misleadingly warned of some risks (like fires, gas leaks, and tipping), but did not warn of the pollutant emissions risk.  H/G/N ¶¶ 36-37.  And Plaintiffs also allege that Defendants' failure to disclose was unlawful and misleading because Defendants had exclusive knowledge of the risk, which was unknown to everyday consumers.  H ¶¶ 36, 54, 57, 60; G ¶¶ 36, 51; N ¶¶ 36, 53, 57.  Each of these is a basis for disclosure independent of Proposition 65.  So Plaintiffs' failure-to-warn claims are not totally dependent on Proposition 65 for this reason too.

Plaintiffs' implied warranty claims are even further afield of Proposition 65.  Those claims are not based on a failure to warn at all, but rather an entirely separate wrong: Defendants' failure to deliver a merchantable product, in breach of an implied term in the contract of sale.  *See, e.g.*, *Reyes v. Beneficial State Bank*, 76 Cal. App. 5th 596,

619-20 (2022) (implied warranty of merchantability claims constitute actions "on a contract" such that Cal. Civ. Code § 1717 applies, unlike claims for fraud or negligent misrepresentation); *Capbran Holdings, LLC v. Firemall LLC*, 2017 U.S. Dist. LEXIS 171875, at *4 (C.D. Cal. Feb. 1, 2017) (observing that "breach of implied warranty claims sound in contract"); *Safeco Ins. Co. of Am. v. Cty. of San Bernardino*, 2006 U.S. Dist. LEXIS 98789, at *29 (C.D. Cal. Oct. 5, 2006) (same).  Because these claims arise from an independent legal obligation arising out of an implied term in the contract of sale, they are not entirely derivative of a Proposition 65 violation.  Moreover, unlike a Proposition 65 violation, Defendants' conduct need not be "knowing[] and intentional[]" to breach implied warranties.  Cal. Health & Safety Code § 25249.6.  This alone shows that Plaintiffs' implied warranty claims do not depend on establishing a Proposition 65 violation.  Indeed, even the *Drake* court did not hold that Proposition 65 barred the *Drake* plaintiff's implied warranty claims; it applied Proposition 65 only to the UCL, CLRA, and FAL claims, and allowed the implied warranty claims to proceed.  *Drake*, 2024 U.S. Dist. LEXIS 25169, *23, *25-26.[11]

**VI.    The EPCA does not preempt Plaintiffs' claims, as this Court correctly held.**

　　**A.    42 U.S.C. § 6297(c) does not preempt Plaintiffs' claims.**

This Court previously held that "Plaintiffs' claims are not preempted by the EPCA, because Plaintiffs' allegations do not concern the EPCA and the effect that

---

[11] Plaintiffs are aware of only one case dismissing implied warranty claims under Proposition 65.  *See Rodriguez v. Endangered Species Chocolate, LLC*, 2024 U.S. Dist. LEXIS 64282, *7-11.  In that case, the court dismissed implied warranty claims alongside statutory consumer protection claims, and the focus of the court and the parties was on the consumer protection claims.  *Id.*  There was no separate analysis for the implied warranty claims.  *Id.*  Indeed, the plaintiff did not even argue that her implied warranty claims arose under a separate obligation than Proposition 65; she argued only that the "duties to disclose arise under California's *consumer protection statutes*, making [her] claims independent of any duty to warn under Proposition 65."  *Rodriguez v. Endangered Species Chocolate, LLC*, No. 23-cv-00054 (S.D Cal.), Dkt. 20 (plaintiff's opposition to motion to dismiss) at 12 (emphasis added).  So the court had no reason to consider—and did not consider—the argument that implied warranty claims arise under a separate obligation.

Plaintiffs' claims would have on energy use, if any, is merely tangential and remote." Op. 13. No allegations have changed to alter the Court's conclusion. And the Court's conclusion was correct, as confirmed by the agreement of two other district courts in materially identical lawsuits against Defendants' competitors.

As this Court recognized in its prior order, the *Drake* court rejected an identical preemption argument for the same reasons. *Drake*, 2024 U.S. Dist. LEXIS 25169, *16-17. And since this Court's prior order, the court in *Bankhurst v. Wolf Appliance, Inc.*, 2024 U.S. Dist. LEXIS 117734 (W.D. Wis. July 2, 2024), reached the same conclusion for the same reasons. First, "the state warranty and consumer protection laws on which [Plaintiffs] base their claims do not concern how much *energy* defendants' appliances consume. Instead, plaintiffs attack the unsafe levels of hazardous *pollutants*—particularly nitrogen dioxide—that the products allegedly emit, as well as defendants' alleged failure to warn consumers of the associated risks." *Id.* at *8. Second, "[n]one of these remedies" that Plaintiffs seek "would necessarily reduce gas consumption." *Id.* at *9.

Defendants repeat their argument that a redesign would result in less gas consumption, in addition to lower levels of emissions. Mot. 38. Once again, Defendants fail to carry their burden of showing that a redesign would necessarily reduce gas consumption. Although some potential redesigns could reduce gas usage, others would not. *See, e.g.*, H/G/N ¶ 31(describing a "flame insert" designed to fit onto existing burners as one possible way to reduce emissions).[12]

Defendants' argument also again ignores that Plaintiffs' claims would not require Defendants to redesign their stoves. Defendants could, at their option, either redesign their stoves or add a warning. And "a gas stove with a warning burns the same amount of gas as one without a warning." Op. 14; *see Bankhurst*, 2024 U.S. Dist. LEXIS 117734,

---

[12] Defendants argue that this redesign "would be impractical." Mot. 40. This is a factual dispute that cannot be resolved on a motion to dismiss. Also, Defendants ignore the possibility that further research into a flame insert like the one proposed in the 1980s could resolve some of the impracticalities Defendants identify.

at *10 ("[M]erely requiring a warning would not have any direct effect on the quantity of gas used in stoves at their point of use in consumers' kitchens."); *Drake*, 2024 U.S. Dist. LEXIS 25169, *17 ("[R]equiring a warning would not have any effect on the quantity of gas used in stoves at their point of use in consumers' kitchens.").

Defendants also argue that Plaintiffs' claims are preempted because "Plaintiffs can prevail only if they prove a 'defect,' and the only defect that they posit is cooking with gas." Mot. 38. This is a mischaracterization of the alleged defect, which is not "cooking with gas," but instead the emission of unsafe levels of hazardous air pollutants as a byproduct of combustion. *See supra* § II. And, as this Court held previously, that Plaintiffs' claims are related to gas use in some way does not render them preempted, because they "do not concern the EPCA and the effect that Plaintiffs' claims would have on energy use, if any, is merely tangential and remote." Op. 13; *see Drake*, 2024 U.S. Dist. LEXIS 25169, *16; *Bankhurst*, 2024 U.S. Dist. LEXIS 117734, *8.[13]

Finally, Defendants invoke the EPCA's preemption waiver provision to argue that the Court failed to apply "the statutorily-prescribed standard." Mot. 38 (citing 42 U.S.C. § 6297(d)(3)). Defendants are wrong. The statutorily prescribed standard for preemption is set forth in 42 U.S.C. § 6297(c), which the Court correctly applied in determining that Plaintiffs' claims were not preempted. The provision Defendants refer to is a separate provision that allows the federal government to waive preemption in certain circumstances. As the Ninth Circuit explained, "EPCA permits the federal government to waive preemption if a State shows that a proposed regulation is needed to meet 'unusual and compelling State or local energy[] interests.' But it stops the federal government from waiving preemption if the 'State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a

---

[13] As described in Plaintiffs' oppositions to Defendants' prior motions to dismiss, Ninth Circuit cases analyzing preemption under similar statutes support this holding. *See, e.g.*, *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 656-59 (9th Cir. 2020); *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014); *Air Transp. Ass'n of Am. v. City & Cty. of S.F.*, 266 F.3d 1064, 1074 (9th Cir. 2001).

1    national basis.'" *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045, 1053 (9th Cir. 2023)

2    (quoting 42 U.S.C. §§ 6297(d)(1)(B)-(C), 6297(d)(3)).

3         So, what § 6297(d)(3) means is that a regulation that is *otherwise preempted* under §

4    6297(c) cannot obtain a preemption waiver if it *also* would "significantly burden

5    manufacturing, marketing, distribution, sale, or servicing of the covered product on a

6    national basis."  It does not mean that a regulation that does not fall within § 6297(c) is

7    preempted merely because it would "significantly burden manufacturing, marketing,

8    distribution, sale, or servicing of the covered product on a national basis."  Otherwise,

9    the EPCA might preempt all sorts of regulations that have nothing to do with energy

10   use—for example, that covered products include a Proposition 65 warning, or that they

11   not be manufactured with PFAS, or that they be sold with a 30-day free return policy, or

12   that they not falsely claim that they can boil water in 30 seconds—because those

13   regulations could be said to "significantly burden manufacturing, marketing, distribution,

14   sale, or servicing of [a] covered product on a national basis."  Defendants' argument

15   would replace the text of § 6297(c) with the text of the waiver provision.

16        In any event, Defendants have not shown that something as simple as warning of

17   pollutant emissions would "significantly burden manufacturing, marketing, distribution,

18   sale, or servicing of [a] covered product on a national basis."  42 U.S.C. § 6297(d)(3).

19   This is pure speculation.  So Defendants' argument fails for this reason as well.

20        **B.    42 U.S.C. § 6297(a) does not preempt Plaintiffs' claims.**

21        Defendants argue that Plaintiffs' failure-to-warn claims are preempted by 42

22   U.S.C. § 6297(a).  That provision preempts state regulations that require "disclosure of

23   information with respect to any measure of energy consumption or water use of any

24   covered product if" the regulation "requires disclosure of information with respect to

25   the energy use, energy efficiency, or water use of any covered product other than

26   information required under" a different EPCA section.  42 U.S.C. § 6297(a).  "Energy

27   use" means "the quantity of energy directly consumed by a consumer product at point of

28   use."  *Id.* § 6291(4).  "Energy efficiency" means "the ratio of the useful output of

services from a consumer product to the energy use of such product." *Id.* § 6291(5).

The Ninth Circuit has instructed that courts "must narrowly interpret § 6297(a) in general." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 497 (9th Cir. 2005). And in particular, courts must "narrowly" interpret "'with respect to' and 'measure of energy consumption.'" *Id.* at 502. "The issue is whether the relation is 'indirect, remote, and tenuous' or not." *Id.* at 502 (quoting *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998)).

Here, as this Court held previously, Plaintiffs' allegations regarding a warning "do not concern energy use as defined under the EPCA," and any relation to energy use "is merely tangential and remote." Op. 13. Plaintiffs allege that Defendants should have warned consumers that their stoves emit hazardous levels of pollutants. This does not require Defendants to disclose "the quantity of energy directly consumed" by their stoves or "the ratio of the useful output of services from a consumer product to the energy use of such product." So Plaintiffs' claims would not require Defendants to disclose either the "energy use" or the "energy efficiency" of their gas stoves. Therefore, § 6297(a) does not preempt Plaintiffs' claims.

## VII. Plaintiffs plausibly allege omission-based fraud claims, as this Court correctly held.

### A. Plaintiffs plausibly allege Defendants' pre-sale knowledge.

"[W]hile circumstances constituting fraud must be alleged with particularity, knowledge may be alleged generally." *McCarthy v. Toyota Motor Corp.*, 2019 U.S. Dist. LEXIS 129207, *11 (C.D. Cal. Apr. 9, 2019) (quote omitted). This Court previously held that Plaintiffs adequately alleged knowledge by alleging "that Defendants are constituents of the natural gas industry; that since the 1980s, the natural gas industry has worried that the US Consumer Product Safety Commission would regulate gas cooking emissions due to indoor air quality concerns; that Defendants monitor and keep track of research on the health effects of their products; and that Defendants are aware that their

1 products emit health-harming pollutants." Op. 22. In addition, the Court recognized

2 that "at the pleading stage, Plaintiffs cannot be expected to have personal knowledge of

3 all of the relevant facts." *Id.*; *see Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1281

4 (C.D. Cal. 2022) ("[T]he pleading requirements are relaxed when 'the circumstances of

5 the alleged fraud are peculiarly within the defendant's knowledge' and the plaintiff 'can

6 not be expected to have personal knowledge of the relevant facts.'") (quoting *Neubronner*

7 *v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)).

8     Plaintiffs' allegations regarding Defendants' knowledge (which are supported by

9 Defendants' own documents) have not changed. H/G ¶¶ 29-30; N ¶¶ 28-30.

10 Defendants simply repeat the same arguments that the Court already rejected, and cite

11 the same cases that the Court already found distinguishable. Mot. 12-44; *see Goldstein*,

12 ECF 36 at 24-25; *Norris*, ECF 36 at 23-24 (collectively explaining how each of

13 Defendants' cited cases is distinguishable). In its prior order, the Court expressly

14 acknowledged the legal principle underlying Defendants' argument—that "[v]ague and

15 sweeping statements about industry research are insufficient to allege knowledge"—and

16 still found Plaintiffs' allegations adequate because they contained more than mere vague

17 and sweeping statements. Op. 21-22. That decision was correct. Indeed, courts have

18 found far less detailed allegations sufficient to plausibly allege knowledge. For example,

19 in *Lemus*, the plaintiff merely alleged, "Defendant researched the known and common

20 side effects of DXM. This is diligence that large companies like Defendant would do

21 when selling a drug." *Lemus v. Rite Aid Corp.*, No. 8:22-cv-253 (C.D. Cal.), Dkt. 17 at ¶

22 30. These allegations "met the low bar" for pleading knowledge. *Lemus*, 613 F. Supp. 3d

23 at 1281. Plaintiffs' allegations here are far more detailed. H/G ¶¶ 29-30; N ¶¶ 28-30.

24     **B.    Plaintiffs plausibly allege a duty to disclose.**

25     This Court previously held that Plaintiffs sufficiently alleged a duty to disclose

26 under California law. The Court concluded that "Plaintiffs have sufficiently pleaded that

27 the defect at issue relates to an unreasonable safety hazard." Op. 23. And,

28 "[a]lternatively, the Court conclude[d] that the alleged defect is central to Defendants'

products' function." *Id.* In addition, the Court concluded that Plaintiffs sufficiently alleged exclusive knowledge—one of the four *LiMandri* factors. *Id.* Neither the relevant facts of the complaints nor the relevant law has changed since the Court reached these conclusions. Defendants simply repeat the same arguments the Court already rejected.

Defendants take issue with the Court's holding that "[d]istrict courts 'do not apply "exclusivity" with such rigidity,'" and that "exclusivity is analyzed in part by examining whether the defendant had 'superior' knowledge of the defect." Op. 23 (quoting *Johnson v. Harley-Davidson Motor Co. Grp., LLC*, 285 F.R.D. 573, 583 (E.D. Cal. 2012)). Defendants contend that the Court's conclusion "conflicts with the Ninth Circuit's statement that 'exclusive,' and *not* 'superior,' is 'the better reading of California law.'" Mot. 44 (quoting *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 864 n.5 (9th Cir. 2018)). Defendants made this same argument before, *Goldstein*, ECF 37 at 14; *Norris*, ECF 38 at 15; *Hedrick*, ECF 49 at 14, and the Court rejected it, concluding that "exclusivity need not be defined literally." Op. 24.

The Court's prior holding was correct. The footnote that Defendants point to in *Hodsdon* expressly did not decide the issue one way or the other, and contained no analysis. 891 F.3d at 864 n.5. And cases decided after *Hodsdon*—both federal and state—continue to hold that a defendant's superior position to know is sufficient to allege this *LiMandri* factor.[14]

For example, in *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993 (N.D. Cal. 2020), the

---

[14] *See, e.g.*, *Kulp v. Munchkin, Inc.*, 678 F. Supp. 3d 1158, 1170 (C.D. Cal. 2023); *Kavehrad v. Vizio, Inc.*, 2023 U.S. Dist. LEXIS 46548, *20 (C.D. Cal. Jan. 26, 2023); *Zurba v. FCA United States LLC*, 2022 U.S. Dist. LEXIS 219137, *13-14 (C.D. Cal. Nov. 10, 2022); *Oddo v. United Techs. Corp.*, 2022 U.S. Dist. LEXIS 25048, *39 (C.D. Cal. Jan. 3, 2022); *Mosqueda v. Am. Honda Motor Co.*, 443 F. Supp. 3d 1115, 1133 (C.D. Cal. 2020); *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1014-1015 (N.D. Cal. 2020); *Fain v. Am. Honda Motor Co.*, 2019 U.S. Dist. LEXIS 230731, *24 (C.D. Cal. Dec. 19, 2019); *Villanueva v. Am. Honda Motor Co.*, 2019 U.S. Dist. LEXIS 228428, *35 (C.D. Cal. Oct. 10, 2019); *Steele v. GM LLC*, 2018 U.S. Dist. LEXIS 226965, *6 (C.D. Cal. Aug. 8, 2018); *Silviera v. GM, LLC*, 2023 Cal. Super. LEXIS 82358, *8 (Cal. Super. Ct. Oct. 23, 2023).

defendant argued that plaintiffs failed to allege exclusive knowledge because "four third-party websites (three of which [were] referenced in the [complaint]) disclose[d] the relevant information." *Id.* at 1015. The court—after citing *Hodsdon* extensively—rejected this argument and held that the plaintiffs adequately alleged this *Limandri* factor by plausibly pleading superior knowledge. *Id.* The court observed that the defect "would plausibly not be within the ken of a reasonable consumer." *Id.* It reasoned that "[i]t is not guaranteed, or even likely, that a reasonable consumer would know to search online for such a difference." *Id.* "And, even if consumers searched for this type of information, it is far from clear that they would find these articles." *Id.*

Here, like in *Anderson*, that Defendants' gas stoves emit pollutants at levels harmful to human health "would plausibly not be within the ken of a reasonable consumer." *Id.* It would be unlikely that a reasonable consumer would know to search for information regarding pollutant emissions from gas stoves, especially because Defendants did not disclose this issue. *See* H ¶¶ 54, 57, 60; G ¶ 51; N ¶¶ 53, 57 ("Reasonable consumers do not conduct independent research on potential defects of consumer products."). And Plaintiffs allege that they—like most reasonable consumers—"did not regularly read sources that would have shown the gas stoves' emissions defect earlier, such as epidemiology journals or World Health Organization guidelines." *Id.* Plaintiffs "had no reason to search for information on a defect that [they] did not know about." *Id.* And, like in *Anderson*, even if Plaintiffs did search for this information, "it is far from clear that they would find [the] articles" about gas stove emissions. *Anderson*, 500 F. Supp. 3d at 1015. These articles were not published in product reviews or other sources that consumers would reasonably check; they were published in specialized scientific journals and reports from governmental agencies. These are sources that Defendants check through their monitoring programs, but not sources that are readily available to consumers.[15]

---

[15] Defendants point out that the *Drake* court concluded that the plaintiff in that

### C.    Plaintiffs plausibly allege reliance.

For an omission claim, a plaintiff can prove reliance "by simply proving that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quote omitted). "That one would have behaved differently can be presumed, or at least inferred, when the omission is material." *Id.* This Court previously held that Plaintiffs adequately alleged reliance because the "omissions were material" such that reliance "can be inferred," and also because "Plaintiffs also allege with sufficient particularity that they relied on the representations in the marketing materials and the list of features." Op. 25.

Defendants argue that Plaintiffs do not "allege with any particularity what 'marketing materials' they actually viewed ***prior*** to purchasing their appliances, or that they viewed their respective user manuals (or packaging or stickers) ***prior*** to purchase." Mot. 46. That is false. As the Court previously held, "Plaintiffs … allege with sufficient particularity that they relied on the representations in the marketing materials and the list of features." Op. 25. Those allegations have not changed. Plaintiffs allege that they relied on marketing materials, lists of features, and in-store models—all of which could have contained a warning—prior to purchase. H ¶¶ 52, 55, 58; G ¶ 48; N ¶¶ 51, 54.[16]

### D.    Plaintiffs plausibly allege UCL "unlawful" and "unfair" claims.

Defendants once again argue that "Plaintiffs' failure to allege that Defendants acted fraudulently also dooms both their UCL 'unlawful' and 'unfairness' claims." Mot. 46. As before, "[b]ecause Plaintiffs[] have sufficiently stated a claim with respect to at least some of Plaintiffs' statutory claims," they state claims under the "unlawful" and "unfair" prongs as well. Op. 26.

---

case did not plead a duty to disclose. Mot. 44. But the *Drake* court offered no reason or analysis whatsoever for this conclusion. *Drake*, 2024 U.S. Dist. LEXIS 25169, *18. So that decision does not undermine this Court's well-reasoned analysis of the issue.

[16] Again, Defendants' reliance on *Drake* for this issue is misplaced because the *Drake* court provided no reasoning or analysis for its conclusion. *Drake*, 2024 U.S. Dist. LEXIS 25169, *18-19.

**VIII.  Plaintiffs plausibly allege implied warranty claims, as this Court correctly held.**

    **A.  Plaintiffs plausibly allege that their gas stoves were unmerchantable.**

This Court previously found that Plaintiffs' sufficiently alleged unmerchantability by alleging (with "non-conclusory allegations") that their stoves emit unsafe levels of pollutants.  Op. 16.  Those allegations have not changed.

Defendants assert that they "did not previously ask the Court to consider whether Plaintiffs plausibly allege that their appliances do not 'conform[] to the standard performance of like products used in the trade.'"  Mot. 46.  To the extent Defendants contend this should alter the Court's conclusion, they are wrong.  As Defendants concede, plaintiffs sufficiently plead unmerchantability by alleging *either* that the products "would not 'pass without objection in the trade' *or* [that they are not] 'fit for the ordinary purposes for which such goods are used.'"  Mot. 46 (emphasis added).  That is because to be merchantable, goods must "meet *each* of the following: (1) Pass without objection in the trade under the contract description.  (2) Are fit for the ordinary purposes for which such goods are used."  *Isip v. Mercedes-Benz USA, LLC*, 155 Cal. App. 4th 19, 24 (2007) (cleaned up) (emphasis added) (quoting Cal. Civ. Code § 1791.1(a)); *see Mexia v. Rinker Boat Co., Inc.*, 174 Cal. App. 4th 1297, 1303 (2009).  Because both requirements are necessary conditions for merchantability, a plaintiff sufficiently pleads unmerchantability by plausibly alleging that the product fails either one.  *See, e.g., Grausz v. Hershey Co.*, 2024 U.S. Dist. LEXIS 14237, at *24 (S.D. Cal. Jan. 25, 2024) (plaintiff failed to plead unmerchantability under "fit for the ordinary purposes" prong but adequately pleaded merchantability under "pass without objection in the trade" prong).

And, as numerous courts have recognized, "pleading a material safety-related defect" is enough to "adequately [plead] that [a product] was unfit for ordinary use."  *Sloan v. GM, LLC*, 287 F. Supp. 3d 840, 880 (N.D. Cal. 2018); *see, e.g., Rouze v. One World Techs.*, 2021 U.S. Dist. LEXIS 220495, at *18 (E.D. Cal. Nov. 12, 2021) ("[A] defect that creates a safety hazard will be enough to render a product unfit for its ordinary

purpose."); *see* Op. 16 (citing *Drake* for the proposition that "[b]y alleging a material safety-related defect, Drake has adequately pleaded that his gas stove was unfit for ordinary use"). Here, Plaintiffs adequately plead that their gas stoves are unfit for ordinary use because they plausibly allege a material safety-related defect: the stoves emit unsafe levels of pollutants during ordinary use.

Defendants also argue that, if all that is required is a warning label, their stoves must be merchantable because "a product that is fit for its ordinary purpose with a warning is equally fit without one." Mot. 48. This argument misunderstands the nature of implied warranty claims. If Defendant had disclosed that their gas stoves emitted unsafe levels of pollutants, then that defect would have become part of the bargained-for exchange. So Defendants' obligations under the contracts for sale would not have included an implied obligation to deliver a stove that did not emit dangerous levels of pollutants during normal use. But here, because Plaintiffs reasonably expected their stoves to be safe, Defendants' obligations included the delivery of a stove that did not emit unsafe levels of pollutants during normal use. *See, e.g.*, *Drimmer v. Wd-40 Co.*, 2006 U.S. Dist. LEXIS 112640, *15 (S.D. Cal. Aug. 3, 2006) ("[T]he theory behind the implied warranty of merchantability is that the product will also conform to reasonable consumer expectations and trade standards.").

## B. Defendants' warranty disclaimer argument does not apply to Plaintiffs' Song-Beverly Act claims.

BSH and Samsung argue that disclaimers in their express warranties bar the *Hedrick* and Norris *implied* warranty claims. Mot. 48-52. This argument does not apply to Plaintiffs' Song-Beverly Act claims.

"Under the Song-Beverly Act, a manufacturer, distributor, or retailer who provides an express warranty cannot 'limit, modify, or disclaim' the implied warranties guaranteed by the Song-Beverly Act. Cal. Civ. Code § 1793. An implied warranty cannot be waived unless a 'conspicuous writing' accompanies the good that warns the buyer that the goods are being sold 'as is' or 'with all faults,' that the entire risk as to the

quality and performance of the goods falls on the buyer, and that the buyer assumes the entire cost of servicing or repair if the goods prove defective.  Cal. Civ. Code §§ 1792.3, 1792.4, 1792.5."  *Parker v. Alexander Marine Co.*, 2015 U.S. Dist. LEXIS 191665, at *18 (C.D. Cal. May 26, 2015).  And when plaintiffs bring implied warranty claims under both the Song-Beverly Act and the "less restrictive" U.C.C., "the disclaimer limitations of [the Song-Beverly Act] apply" to the Song-Beverly Act claims.  *Id.* at *18-19.  Defendants do not contend that their disclaimers meet these requirements (and they indisputably do not), so these disclaimers cannot bar Plaintiffs' Song-Beverly Act claims.

## C.   Defendants' warranty disclaimer argument fails because Defendants' disclaimers were not conspicuous.

This Court previously held that Defendants' disclaimers were not conspicuous.  Op. 18.  Defendants argue that this Court's conclusion was wrong because the tables of contents in Defendants' user manuals disclose that the product contains an express warranty.  Mot. 48-50.  But the mere fact that a product comes with an express warranty does not inform the consumer that the manufacturer disclaims all implied warranties.  It is the disclaimer of implied warranties—not the existence of an express warranty—that must be "conspicuous" under the U.C.C.  Cal. Com. Code § 2316(2); 810 Ill. Comp. Stat. 5/2A-214(2).  And the tables of contents in Defendants' user manuals do not disclose that the implied warranty of merchantability is disclaimed.

Samsung's table of contents merely states that "Warranty (U.S.A.)" appears on page 44.  *Samsung* ECF 67-1 at 7.  Nothing about this informs consumers that the express warranty contains a disclaimer of all implied warranties.  Similarly, BSH's table of contents states that a "Statement of limited product warranty" appears on page 31 and, as the fifth of six subheadings, that "Warranty exclusions" to that limited express warranty appear on page 32.  *Hedrick*, ECF 70-2 at 5.  Again, merely noting the existence of a limited express warranty, and that the express warranty contains certain exclusions,[17]

---

[17] The "warranty exclusions" listed on page 32 are exclusions of the express warranty "described herein."  *Hedrick*, ECF 70-2 at 35.

does not tell consumers that their implied warranties are disclaimed.

Indeed, the table of contents in BSH's user manual at issue in *Hirsch v. BHS Home
Appliances Corp.*, 2022 U.S. Dist. LEXIS 185050 (C.D. Cal. July 21, 2022), contained
exactly the same language. *See Hirsch v. BHS Home Appliances Corp.*, No. 8:21-cv-01355
(C.D. Cal.), Dkt. 18-3 at 7. But the court in that case nonetheless found BSH's
disclaimer to be insufficiently conspicuous because it was "buried in the middle of a 75-
page long user manual"; (2) "not bolded" (although formatted "in all caps"); (3) located
"at the very end of the manual's 2-page long description of the express warranty Bosch
provides to its consumers"; and (4) "not set-off by an independent header, or other
contrasting feature, that would draw the reader's attention to the disclaimer." *Hirsch*,
2022 U.S. Dist. LEXIS 185050, at *17.[18] As this Court found previously, Defendants'
disclaimers in this case fail for similar reasons. Op. 18.

## IX.    Plaintiffs plausibly allege unjust enrichment, as this Court correctly held.

Defendants argue that Plaintiffs' unjust enrichment claims must be dismissed
because Plaintiffs have failed to allege fraud with particularity under Rule 9(b). As this
Court held previously, "[b]ecause Plaintiffs plead at least some of their fraud-based
claims with sufficient particularity," this argument fails. Op. 27.

## X.    Plaintiffs plausibly allege entitlement to punitive damages.

Punitive damages are available where "the defendant has been guilty of
oppression, fraud, or malice." Cal. Civ. Code § 3924(a). Plaintiffs plausibly allege that
Defendants' conduct was fraudulent, because Defendants fraudulently failed to disclose
that their gas stoves emitted unsafe levels of pollutants. *See supra* § VII. They allege that
"Defendant[s'] continued sale of the Products, without providing warnings about the

---

[18] The Ninth Circuit case that Defendants assert is inconsistent with *Hirsch*, *Oltman
v. Holland Am. Line-USA, Inc.*, 538 F.3d 1271 (9th Cir. 2008), applied a different standard
under maritime law, and relied on numerous conspicuous notices throughout the travel
booklet telling the traveler to read the contract at issue (i.e., not just the "CONTRACT
(PLEASE READ)" language in the table of contents. *Id.* at 1276. *Hirsch* is perfectly
consistent with *Oltman*, and is considerably more on-point and persuasive in this context.

emissions of harmful pollutants, is not the result of accident or coincidence. Defendant[s] [have] known of the risk of harmful emissions for years, if not decades." H/N ¶ 40; G ¶ 39. In addition, Plaintiffs allege that "Defendant[s'] decision to sell Products to consumers with no warning of the emissions and safety hazards the products present, despite Defendant[s'] knowledge of these emissions and safety hazards, improperly focuses on profit over the safety of consumers and demonstrates a willful and conscious disregard of the rights and safety of consumers like Plaintiffs." H/N ¶ 47; G ¶ 46.[19] These allegations sufficiently allege fraud, as well as oppression and malice, and therefore Plaintiffs adequately allege entitlement to punitive damages.

Defendants argue that Plaintiffs have not "plausibly show[n] conduct or ratification by a corporate officer, director, or agent of any Defendant." Mot. 53. But Plaintiffs allege precisely this: "Defendant[s'] continued sale of [their] Products, without warning, is the result of a decision committed, authorized, or ratified by Defendant[s'] executives or directors." H/N ¶ 40; G ¶ 39. And that allegation is plausible, because Defendants—including its corporate officers, directors, and agents—have known about the risks for years, and have not caused Defendants to redesign their stoves or warn about the risk. *See* H ¶ 29 ("[T]his robust risk management is conducted in all BSH companies, as well as communicated to a central management team."); G ¶ 29 (Whirlpool's "enterprise risk management" process "receives Board of Directors and management oversight."); N ¶ 29 ("Defendant's risk management processes are robust and communicated to its executive team.").

## XI.    Conclusion.

For the foregoing reasons, Defendants' motion should be denied in its entirety.

---

[19] This allegation was not included in the prior complaints. *See* Redline H/N ¶ 47; Redline G ¶ 46.

Dated: September 20, 2024                Respectfully submitted,

                                          By: */s/ Gabriel Doble*

                                          Gabriel Doble (Cal. Bar No. 335335)
                                          gabe@dovel.com
                                          Richard Lyon (Cal. Bar No. 229288)
                                          rick@dovel.com
                                          Simon Franzini (Cal. Bar No. 287631)
                                          simon@dovel.com
                                          Jonas B. Jacobson (Cal. Bar No. 269912)
                                          jonas@dovel.com
                                          Martin Brenner (Cal. Bar No. 333540)
                                          martin@dovel.com
                                          DOVEL & LUNER, LLP
                                          201 Santa Monica Blvd., Suite 600
                                          Santa Monica, California 90401
                                          Telephone: (310) 656-7066
                                          Facsimile: (310) 656-7069

                                          *Attorneys for Plaintiff*